IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0166** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **BRIAN MCCULLOUGH,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Presently before the court is a motion (Doc. 124) to suppress evidence filed by defendant Brian McCullough ("McCullough"). McCullough contends that his Fourth Amendment rights were violated when law enforcement officers unlawfully seized him on October 8, 2010. For the following reasons, the court will deny the motion.

**I.    Findings of Fact**[1]

On October 8, 2010, at approximately 10:13 p.m., law enforcement officials received a call from dispatch that shots had been fired near the intersection of North 18th Street and Regina Street, a high crime area in Harrisburg, Pennsylvania.[2]  (Hr'g Tr. at 4-7, 31).  Approximately two minutes later, two members of the Harrisburg Police Department's Street Crime Unit—Officer Milo

---

[1] These findings are based on the court's determination of credible testimony presented at the August 29, 2011, evidentiary hearing. Citations to the August 29, 2011, hearing transcript are abbreviated throughout as "Hr'g Tr."

[2] McCullough does not dispute that the area surrounding the intersection of North 18th Street and Regina Street is a high crime area. (See Hr'g Tr. at 49, 51; Docs. 125; 180).

Hooper ("Officer Hooper") and Adult Probation Officer Travis Banning ("Officer Banning")—arrived at the scene in an unmarked Chevy Tahoe. (Id. at 4, 6, 57-58). While driving south on North 18th Street approaching Carnation Street,[3] Officer Hooper and Officer Banning observed a group of males walking northbound on the west side of the street. (Id. at 8, 57-58). One of the individuals, later identified as Michael Hansley ("Hansley"), appeared to have an object in his hand, made a motion in the shadows, and then continued walking northbound on 18th Street with his left arm pinned against his body and his right arm freely swinging. (Id. at 9-12, 26, 61). Based on his training, Officer Hooper believed Hansley had a firearm in his waistband. (Id. at 11). A marked K-9 unit driven by Officer Tyron Meik ("Officer Meik"), a member of the Harrisburg Street Crimes Unit, also responded to the call from dispatch, and Officer Hooper indicated over the radio that he had spotted an individual who may have a gun on him. (Id. at 13, 76-77). After Hansley walked past Officer Hooper's and Officer Banning's vehicle, Officer Meik shined a spotlight on Hansley from his marked K-9 unit. (Id. at 13, 77). Officer Meik followed Hansley as he turned left onto Carnation Street walking westbound at a brisk pace with several other individuals. (Id. at 14, 77-78). Hansley looked at Officer Meik and then ran southbound alongside a residence towards Regina

---

[3] Carnation Street runs parallel to Regina Street. (Id. at 14).

Street. (Id. at 78-80). Officer Meik then contacted the other units in the area regarding Hansley's whereabouts.[4] (Id. at 79-80).

Meanwhile, Officer Hooper had continued southbound on 18th Street and turned right onto the 1700 block of Regina Street. (Id. at 17). Officer Hooper observed Hansley emerge from between two houses on the north side of Regina Street running westbound. (Id.) Next, Officer Hooper noticed an individual, later identified as McCullough, wearing a black jacket, black pants, and a white shirt emerge from between two different houses on Regina Street. (Id. at 18-19, 27-28). Hansley ran westbound towards McCullough, briefly stopped, interacted with McCullough, and then walked in the opposite direction towards Officers Hooper and Banning. (Id. at 18, 23-24). McCullough took off at a run between two houses on Regina Street heading towards Carnation Street. (Id.)

Officer Hooper testified that he believed that the brief interaction between Hansley and McCullough involved an exchange of some sort due to their close proximity and the fact that Hansley immediately stopped running after the interaction.[5] (Id. at 23-24, 34-35). During or immediately after the brief interaction between Hansley and McCullough, Officer Banning exited the vehicle and yelled

---

[4] Officer Meik lost track of the other individuals. (Id. at 79).

[5] McCullough asserts that the testimony of Officer Banning is impossible to reconcile with the testimony of Officer Hooper. (Doc. 180, at 7). The court disagrees. Although Officer Banning did not see any physical contact or state that Hansley and McCullough came to a complete stop, he testified that McCullough and Hansley appeared "together." (Id. at 65-67). This is consistent with the essence of Officer Hooper's testimony.

stop while Officer Hooper provided a description of McCullough over the radio and notified the other units in the area that McCullough had run from the officers towards Carnation Street. (Id. at 27, 64-66). Hansley put his hands in the air and was later arrested by the officers. (Hr'g Tr. at 25, 45).

Officer Jeffrey Cook ("Officer Cook") and his partner Probation Officer Allen Shipley ("Officer Shipley"), members of the Harrisburg Street Crime Unit, heard Officer Hooper's report about McCullough running towards Carnation Street on their radio and began searching backyards between Regina Street and Carnation Street. (Id. at 71). Officer Cook observed McCullough laying on the porch of a vacant house located at 1706 Regina Street. (Id.) Officer Cook drew his weapon and yelled "police, let me see your hands, let me see your hands" multiple times, but McCullough failed to comply. (Id. at 71, 85) Instead, McCullough put a white plastic object into his pants. (Id. at 73, 84-85).

Officer Joshua Hammer and Adult Probation Officer McConnell, members of the Harrisburg Street Crime Unit, also responded to Officer Hooper's report about McCullough running towards Carnation Street. (Id. at 83-84). Officer Hammer parked his vehicle on Regina Street, heard Officer Cook's commands, and ran over to the yard of 1706 Regina Street. (Id. at 84). Officer Hammer repeatedly yelled "show me your hands" and slowly approached McCullough. (Id. 86-87). After Officers Hammer and Cook made several more commands, McCullough put his hands in the air and said "I don't have anything on me" as Officer Hammer placed him in handcuffs. (Id. at 73, 84-87). Officer Hammer testified that he handcuffed

McCullough for officer safety purposes. (Id. at 96). As Officer Hammer picked up McCullough to handcuff him, he and Officer Cook observed in McCullough's immediate proximity a digital scale and a plastic baggy that they suspected contained marijuana.[6] (Id. at 72-73, 85-87, 93). Officer Hammer then placed McCullough under arrest. (Id. at 86). Later, during a strip search of McCullough at the police station, Officer Hammer discovered a plastic baggy containing crack cocaine on McCullough's person. (Id. at 91).

## II. Procedural History

On May 4, 2011, a Federal grand jury returned a two-count Indictment against McCullough and several other defendants. (Doc. 1). McCullough pled not guilty at his arraignment on May 24, 2011. (Doc. 85). McCullough filed the instant motion to suppress on June 15, 2011. (Doc. 124). The court conducted an evidentiary hearing on August 29, 2011. (Doc. 161). The motion has been fully briefed and is ripe for disposition.

## III. Discussion

The Fourth Amendment of the United States Constitution secures "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. A Fourth Amendment seizure inquiry involves a two-step analysis: (1) determining whether a seizure occurred, and if so, (2) determining

---

[6] A field test at the station later confirmed that the bag contained marijuana. (Id.)

whether the seizure was reasonable under the circumstances. See United States v. Smith, 575 F.3d 308, 312 (3d Cir. 2009).

### A. Whether a Seizure Occurred

A seizure occurs "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 545 (1980). A mere show of authority by law enforcement officials does not constitute a seizure. California v. Hodari D., 499 U.S. 621, 626 (1991). Instead a seizure "requires either physical force . . . or, where that is absent, submission to the assertion of authority." Id. (emphasis omitted); United States v. Waterman, 569 F.3d 144, 145 (3d Cir. 2009) (stating that Hodari D. is applicable to both Terry stops and arrests).

In the instant matter, the court concludes that Officer Hammer seized McCullough only after McCullough complied with his directives by putting his hands in the air. Officer Cook did not seize McCullough by drawing his weapon and yelling "police, let me see your hands, let me see your hands" multiple times because McCullough repeatedly refused to comply with the commands.[7] The Third Circuit "requires, at minimum, that a suspect manifest compliance with police orders" to find that a seizure occurred. Waterman, 569 F.3d at 145 (holding that no seizure occurred when police drew their guns in a "show of authority" because they did not use physical force and the defendant refused to comply with the officers'

---

[7] Officers Hooper and Banning also did not seize McCullough because McCullough never complied with Officer Banning's command to stop.

directive to raise his hands) (citations omitted); see also United States v. Valentine, 232 F.3d 350, 358–59 (3d Cir. 2000). McCullough complied with commands to show his hands only after Officer Hammer arrived at the scene, made additional directives, drew his gun, and slowly approached McCullough. (Hr'g Tr. at 73, 84-85).

### B. Whether the Seizure was Reasonable Under the Circumstances

The Supreme Court has recognized two types of seizures of persons: (1) investigative detentions and (2) arrests. Terry v. Ohio, 392 U.S. 1, 15-17 (1968). A law enforcement official may conduct a brief investigatory stop if they have "reasonable, articulable suspicion that criminal activity is afoot," but police officers must have probable cause to justify longer and more intrusive detentions that are considered full-scale arrests. United States v. Whitfield, 634 F.3d 741, 744 (3d. Cir. 2010) (citations and quotations omitted). Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity" viewed from the perspective of an objectively reasonable law enforcement official. Ornelas v. United States, 517 U.S. 690, 696 (1996) (citations and quotations omitted). Probable cause is a more demanding standard, requiring the police officer to have reasonably trustworthy information within his or her knowledge "sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002). In the instant matter, the court finds that Officer Hammer had

reasonable suspicion to temporarily detain McCullough and probable cause to arrest him upon the discovery of the digital scale and suspected marijuana.

### 1. Officer Hammer's Initial Detention of McCullough

McCullough contends that the officers lacked both reasonable suspicion and probable cause to seize him. (Doc. 180, at 6). In assessing whether law enforcement officials had reasonable suspicion to detain an individual for investigatory purposes, courts must consider the "totality of the circumstances," i.e., everything that occurred prior to the seizure. United States v. Arvizu, 534 U.S. 266, 273 (2002). The Third Circuit has highlighted a number of factors pertinent to the reasonable suspicion determination including, *inter alia*, whether: (1) the police detained the suspect in a high-crime area; (2) the suspect displayed nervous, evasive behavior; (3) the suspect attempted to elude the officers; and (4) the hour of day. See Whitfield, 634 F.3d at 744; United States v. Brown, 159 F.3d 147 at 149-50 (3d Cir. 1998). The Third Circuit also has emphasized that actions a defendant takes after he or she fails to comply with law enforcement orders can be considered in evaluating whether reasonable suspicion existed at the time the seizure occurred. Valentine, 232 F.3d at 358-59; see also United States v. Moorefield, 111 F.3d 10, 14 (3d Cir. 1997) (officers had reasonable suspicion in part because of the defendant's "furtive hand movements and refusal to obey the officers' orders").

It is clear that Officer Hammer had particularized and objective bases for suspecting that McCullough was involved with criminal activity. (See Hr'g Tr. at 83-96). Officer Hammer stated that he learned from Officer Hooper's radio dispatch

McCullough's description and that he had run from the Officer Hooper's location at Regina Street towards Carnation Street. (Id. at 84, 92, 94-95). Officer Hammer located McCullough hiding in an abandoned porch in the immediate proximity of an area where shots had been reported fired shortly before. (Id. at 84, 95). Additionally, Officer Hammer testified that when he initially arrived at 1706 Regina Street, McCullough refused to comply with police commands, made erratic movements with his hands and appeared to be attempting to hide a plastic baggy on his person. (Id. at 85, 95). The undisputed record also indicates that all of these events occurred after 10:00 p.m. near the intersection of North 18th and Regina Streets, a high crime area. (Hr'g Tr. at 31, 49, 51).

McCullough argues that the above facts fail to establish reasonable suspicion because they fail to demonstrate his involvement in any criminal activity. (Doc. 180, at 7-10). Specifically, McCullough contends that there is no evidence that he ran because he saw police officers. (Doc. 125, at 4). McCullough arguments are based primarily on his subjective intentions and knowledge.[8] The relevant inquiry,

---

[8] McCullough testified at the evidentiary hearing that he ran out fear. (Hr'g Tr. at 45). The court finds McCullough's alleged explanation for his flight to be incredible and contradicted even by his own testimony. McCullough testified that immediately before Officers Hooper's and Banning's unmarked vehicle arrived at the scene, Hansley specifically told him that the "police were coming" and that he had spotted an unmarked vehicle minutes before. (Id. at 41-42, 44). McCullough also testified that he saw Hansley put his hands in the air after the unmarked vehicle arrived. (Id. at 45). The court finds that McCullough—a parolee previously arrested two times—would have known under the circumstances that the unmarked vehicle contained police officers and that McCullough was trying to evade the police when he began to run.

9

however, is whether Officer Hammer could have objectively believed that Mccullough was evading law enforcement officers on the basis of the information known by him at the time McCullough was seized.  In light of the totality of the circumstances, there was sufficient justification for an objectively reasonable law enforcement officer to briefly detain McCullough for investigative purposes.[9]

In the case *sub judice*, Officer Hammer heard over his police radio that a black male wearing a black jacket and a white shirt had run from Officer Hooper's location at the 1700 block of Regina.[10]  (Hr'g Tr. 92).  The Supreme Court has remarked that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause" and has found that even the unverified report from a known informant can be sufficiently reliable to justify a Terry stop in some cases.  Alabama v. White, 496 U.S. 325, 330 (1990); see Adams v. Williams, 407

---

[9]  Contrary to McCullough's assertion, Officer Hammer testified that he believed McCullough may have been involved in the shooting and that he wanted to question McCullough on the subject.  (Hr'g Tr. at 86, 95).

[10]  McCullough focuses on the facts and circumstances known by Officer Hooper.  McCullough does not argue, however, that the collective action doctrine applies in this case.  The collective action doctrine allows the knowledge of one law enforcement official to be imputed to the officer who conducted the seizure, search, or arrest.  Whitfield, 634 F.3d at 745-46.  There is no evidence in the record that the officers "worked together as unified and tight–knit team."  Id. at 746 (holding that the collective action doctrine applied to a Terry stop when three marked police cars were patrolling an area of Camden, New Jersey, in a caravan).  To the contrary, although the officers communicated information over the radio, the officers appeared to be on separate patrols that evening and independently responding to the call from dispatch of shots fired at the intersection of North 18th and Regina Streets.  Therefore, only the knowledge of Officer Hammer, the law enforcement official who actually seized McCullough, is relevant.

U.S. 143, 147 (1972). Clearly, a law enforcement officer can rely on the first-hand report of another officer in the midst of responding to a fast-paced and time-sensitive situation in the absence of any conflicting information or any other reason to doubt the accuracy of the report.[11] Moreover, shortly thereafter, Officer Hammer parked near 1706 Regina Street, exited his vehicle, and discovered McCullough hiding in an abandoned porch refusing to comply with the instructions of another officer. (Hr'g Tr. at 84-85).

The reasonable suspicion inquiry involves probabilities not hard certainties. United States v. Cortez, 449 U.S. 411 at 417-18 (1981); Valentine, 232 F.3d at 359

---

[11] The rule that "an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis" is inapplicable to this case. Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997). Officer Hammer did not rely on another officer's probable cause or reasonable suspicion determination. Instead, Officer Hammer made his own independent reasonable suspicion determination based, only in part, on factual information provided to him by another officer. Applying the above rule would, in effect, impose a higher standard on factual information provided by fellow law enforcement officials than on information provided by witnesses and informants.

Regardless, the court finds that Officer Hooper himself had objectively reasonable bases to believe McCullough was evading law enforcement. Officer Hooper had spotted several individuals walking with Hansley towards Carnation Street and both Hansley and McCullough emerged coming from between houses that separated Carnation Street from Regina Street shortly after Officer Meik shined a spotlight on Hansley from his marked K-9 unit on Carnation Street. (Hr'g Tr. at 17-18). Furthermore, Officer Hooper observed McCullough interact with Hansley—an individual in the midst of flight from a marked police vehicle—as he trailed from a short distance in his vehicle. (Hr'g Tr. at 18, 25-26, 35). Officer Hooper testified that he believed an exchange occurred between Hansley and McCullough during this interaction because their close physical proximity and that after this apparent exchange Hansley abruptly stopped and McCullough ran. (Hr'g Tr. at 25-26, 35). Officer Hooper could reasonably infer from these facts that McCullough was evading the police when he began to run.

(remarking that reasonable suspicion may be "based on acts capable of innocent explanation"). Although arguably innocent in isolation, together the above facts "serve to eliminate a substantial portion of innocent travelers." Karnes v. Skrutski, 62 F.3d 485, 493 (3d Cir. 1995). Moreover, the Third Circuit has consistently found reasonable suspicion to conduct a Terry stop under similar circumstances. See United States v. Brown, 159 F.3d 147 at 149-50 (3d Cir. 1998) (holding that reasonable suspicion existed to conduct a Terry stop when the defendant ran after law enforcement officials spotted him in a high crime area, late at night, and in close proximity to the crime scene a few minutes after officer received a call of shots fired); see also United States v. Sewell, 381 Fed. Appx. 159, 161 (3d Cir. 2010); United States v. Wynne, 27 Fed. Appx. 106, 108 (3d Cir. 2002).

Finally, McCullough contends that the initial detention was a full-blown arrest requiring probable cause. (Doc. 180, at 8). McCullough's argument is based on the fact that Officers Cook and Hammer drew their weapons and Officer Hammer handcuffed McCullough. When conducting an investigatory stop, officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Edwards, 53 F.3d 616, 619-20 (3d Cir. 1995) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). Courts have consistently stated that "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." See Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) (citing cases); see also United

States v. Holyfield, 282 Fed. Appx. 129, 131 (3d Cir. 2008); United States v. Coker, 223 Fed. Appx. 136, 141 (3d Cir. 2007); Edwards, 53 F.3d at 619-20 (citing cases).

The court finds credible Officer Hammer's testimony that he initially only intended to detain McCullough only to question him about the shooting and that he handcuffed him because of safety concerns. (Hr'g Tr. 94-95). Specifically, Officer Hammer noted his safety concerns related to the reports of multiple shots fired in the area, McCullough's failure to comply with the officers' commands, and the fact McCullough ran from police and hid in an abandoned porch. (Id. at 86-87, 95). The court also notes that the investigative detention lasted only a matter of seconds because Officer Hammer almost immediately discovered the digital scale and marijuana in McCullough's close proximity and placed him under arrest . (Hr'g Tr. at 87, 93). Thus, the initial detention was reasonable under the circumstances.

### 2. Officer Hammer's Arrest of McCullough

As explained above, Officer Hammer placed McCullough under arrest only after he discovered a digital scale and a bag that his training and experience led him to suspect contained marijuana. (Id. at 87, 96). Specifically, Officer Hammer noted that he suspected the bag contained marijuana because of the green, leafy vegetable appearance of the contents of the bag and the type of knot used on the bag. (Id.) The court finds that the discovery of the bag containing suspected marijuana and the digital scale established sufficient probable cause to arrest McCullough. See United States v. Williams, 413 F.3d 347, 353 (3d Cir. 2005); see also

United States v. Simmons, No. 06-3902, 2007 WL 3122169, at *3 (3d Cir. Oct. 26, 2007); United States v. Naylor, No. 06-617, 2007 WL 1101282, at *3 (E.D. Pa. Apr. 12, 2007).

### III. **Conclusion**

For the foregoing reasons, the motion to suppress will be denied. An appropriate order follows.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated: November 16, 2011

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0166** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **BRIAN MCCULLOUGH**, | : | |
| | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 16th day of November, 2011, upon consideration of the motion (Doc. 124) to suppress filed by defendant Brian McCullough, and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 124) to suppress is DENIED.

          S/ Christopher C. Conner
          CHRISTOPHER C. CONNER
          United States District Judge